PEOPLE v. MARTIN et al.

(Court of Special Sessions, New York County. January, 1912.)

THEATERS AND SHOWS (§ 3*)—"PUBLIC EXHIBITIONS."

An entertainment provided by the management of a restaurant, consisting in dancing, singing, etc,. does not constitute a "public exhibition," within Greater New York Charter (Laws 1897, c. 378) §§ 1472, 1473, 1474, which make it a misdemeanor to conduct a public exhibition without a license, where the entertainment constitutes a gratuitous contribution by the management to the guests' entertainment.

[Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 3; Dec. Dig. § 3.*

For other definitions, see Words and Phrases, vol. 6, p. 5788.]

Prosecution against Louis Martin and another for a misdemeanor. Acquittal directed.

Argued before DEUEL, HOYT, and McINERNEY, JJ.

James E. Smith, Deputy Asst. Dist. Atty., of Olean, for the People.

Henry L. Scheuerman, of New York City, and Stephen Baldwin, of Brooklyn, for defendants.

DEUEL, J. Upon a complaint before a city magistrate, upon which the defendants were held for trial, the district attorney filed an information charging them with a misdemeanor under sections 1472, 1473, and 1474 of the Greater New York Charter (Laws 1897, c. 378). The section first mentioned reads as follows:

"Public Exhibitions to be Licensed.

"Sec. 1472. It shall not be lawful to exhibit to the public in any building, garden or grounds, concert room or other place or rooms within the city of New York, any interlude, tragedy, comedy, opera, ballet, play, farce, minstrelsy or dancing, or any other entertainment of the stage or any part or parts therein, or any equestrian, circus, or dramatic performance, or any performance of jugglers or rope dancing, or acrobats, until a license for the place of such exhibition for such purpose shall have been first had and obtained, as hereinafter provided."

Section 1474 makes any violation thereof a misdemeanor calling for imprisonment in the penitentiary for a term not less than three months nor more than one year, or by a fine not less than $100 nor more than $500, or by both such fine and imprisonment.

The facts developed at the trial in support of the information, briefly stated, are as follows:

The Louis Martin Corporation, of which the defendant Louis Martin is the president, and, as the evidence fairly discloses, the general manager, and the defendant Netter, as to the matter constituting the alleged misdemeanor, is an assistant manager, carries on at No. 1457 Broadway, in the county of New York, the business known as "Martin's Restaurant," for which it has a hotel license for trafficking in liquors, under the Liquor Tax Law, and an "all-night license" granted by city authorities.

The business is carried on in a seven-story building, wherein the first three floors are used as ordinary dining rooms. The fourth

floor presents the locus delicti, known to the defendants and to a portion of the public as a "Cabaret." It is a dining room, 60x54, and the floor space, except a section 22x16, covered by a rug, contains tables seating from four to six persons. Upon the rug is given the entertainment which the people claim is a public exhibition within the terms of section 1472, already quoted. It consists of dancing and singing, accompanied by music from an orchestra. Some of the dances were by one person; three by a male and a female. The singing consisted of solos and one quartette. There were also two songs and dances, each by a female. This dining room, according to the evidence, is opened about 11 p. m. The entertainment given on the rug begins at midnight and ends at 2 a. m. It is intended for theater and opera parties and others having a predilection for late suppers and midnight dalliance. No admittance fee is charged, and no one is allowed to enter or leave the elevator at that floor who is not included in a previous reservation for that particular night. There is no charge or fee for this reservation, which can be had only by the action of the hotel management. The evidence discloses no direct compensation from the entertainment in question, and warrants no conclusion that it is other than a gratuitous contribution by the management to the guests of the evening. There are no stage, no curtain, no scenic effects, no printed program, and no announcements. From beginning to end, as testified by the people's witnesses, there was nothing "offensive to good taste or public decency, to good morals or to the morals of the community."

These facts present a single question of law: Is this entertainment a public exhibition, within the scope of the charter provision; i. e., was the primary purpose of the entertainment an exhibition for pecuniary gain, or was it given as an incident to some other legitimate pursuit?

This question has been argued orally and by instructive briefs by respective counsel. The question whether it be an "entertainment of the stage" has also been ingeniously argued, to which the best answer is that, if the exact program of singing, dancing, and music involved herein were to be presented in any hall in this city, stage or no stage, to which the public were invited to attend and witness by paying an admission fee, there could be no doubt of the necessity to procure a license in advance of opening, in order to escape the penalties called for by the charter. Therefore the sole question is as stated: Was the performance a "public exhibition"?

The subtitle, taken bodily from the Consolidation Act, reads, "Public Exhibitions to be Licensed"; and the section itself reads, "It shall not be lawful to exhibit to the public." There is nothing in the original enactment, and there is nothing in any of the amendments since made, to indicate that "public" was to have any other than its natural and ordinary sense. By Laws 1829, c. 302, it was purely a revenue measure in aid of the Society for the Reformation of Juvenile Delinquents, which we now know as the House of Refuge. Section 2 of that act required those who paid an excise tax for trafficking in

liquor, including "public gardens," to pay an additional $1.50 for the purposes of the act; and section 4 read:

"No theater or circus, or building for exhibiting theatrical or equestrian performances, in the city of New York, shall be opened for such exhibition" until the mayor shall grant a license therefor.

Each theater was to pay $500 and each circus $250. In 1839 (chapter 13) the House of Refuge was given the right of action to enforce a civil penalty of $500 for any failure to comply with the act, and "public gardens" and others dealing in liquors were relieved of former liability. The House of Refuge continued to be the beneficiary until the litigation of Wallach v. Mayor, 3 Hun, 84, attracted considerable public attention thereto. The General Term sustained the constitutionality of the measure, but the Legislature soon thereafter directed this money to go into the city treasury.

There have been numerous amendments: In 1862 (chapter 281) the measure was to apply generally throughout the state; but section 6 gave all local authorities outside of this city the right to regulate the issuance of the license and the amount of the tax. In 1872 (chapter 836) under the title, "An act to regulate places of public amusement in the city of New York," the law took the shape and form, in all essentials, as it now appears in the charter. I have examined these different amendments with some care, and I fail to find the slightest indication of a legislative intent to put any limitation upon the ordinary meaning of "public exhibition."

In connection with the foregoing necessarily very brief historical survey, it is quite pertinent to mention that the amount of the tax, $500, and the yearly term of the license, May 1st, remain the same as originally fixed. In determining now what the Legislature actually meant by "public exhibition," in a statute with so many years behind it, we have legitimate recourse to judicial construction and to administrative determination. "Contemporanea expositio est fortissima lege."

Upon the administrative side we may take judicial cognizance of the multitudinous aids to increased sales by free exhibitions, in which pianos, furniture, costumes, and many other commercial lines have figured prominently. We may likewise consider hotels and restaurants, which have introduced minstrelsy and professional story telling, and a whole orchestra concentrated in a single individual, and various other devices to attract custom. If any one of these had started the attractive feature as a direct money-making device, by charging an admission fee thereto, there could be no question of the application of the charter provision. Whenever the administrative officers have been in doubt, they have had recourse to the judiciary, which, apparently, has adopted a like principle for guidance. If the direct object be pecuniary gain, a license to exhibit is necessary; if the exhibition be free, and solely to attract patronage to some other legitimate pursuit, a license to exhibit is not necessary. Mayor v. Eden Musee, 102 N. Y. 596, 8 N. E. 40; People v. Campbell, 51 App. Div. 565, 65 N. Y. Supp. 114; People v. Royal, 23 App. Div. 258, 48 N. Y. Supp.

742; Society v. Neusbach, 16 Wkly. Dig. 349; Matter of Allen, 34 Misc. Rep. 698, 70 N. Y. Supp. 1017.

In the Eden Musee Case, the Court of Appeals, as to the charter provisions now in question, said:

"Taking the statute in all its terms, it evidently meant to include all classes of public exhibitions such as are usually conducted on a stage for the observation and amusement of the public."

Mr. Justice Ingraham, in writing the opinion of the Appellate Division in People v. Campbell, wherein a piano exhibition by two men in a public saloon was the basis of the charge for violating this particular charter provision, and to which no specific admittance fee was exacted, quoting the Court of Appeals as above noted, said:

"It seems that the performance upon this piano was not an exhibition within the meaning of this definition, which evidently related to the class of public exhibitions usually conducted or produced upon a stage, at which the public attend for the purpose of seeing the exhibition, and not a case where music is performed as a mere incident to some business where no admission fee is charged."

In People v. Royal, the court dealt with a situation largely akin to the present. Brooklyn was not then a part of the Greater City, and came in under the general statue which gave local authorities the right to make ordinances controlling places of amusement, and "exhibitions" were included as requiring a license. The defendant, being the author and copyright owner of a book on "Gambling and Confidence Games Exposed," rented two rooms on Fulton street. In each room free exhibitions were given with dice, cards, shells with a pea, etc., in connection with lectures as to how gamblers do tricks to deceive the unwary, and ending with advice to buy and study the book. In reversing the judgment of conviction in Special Sessions, sustained on appeal by the County Court, the Appellate Division in a per curiam opinion said:

"The connection in which it [exhibitions] appears in the ordinance shows that its meaning has relation to entertainments where the exhibition itself is the principal thing and from which the exhibitor derives or expects to derive profit."

These judicial interpretations sustain the administrative determination, through many years, that the primary object of the exhibition itself determines whether or not it comes within the ban of the statute. The evidence in the present case permits no conclusion that direct pecuniary benefit accrued by reason of the entertainment at these midnight suppers, but it does compel the conclusion that such entertainment was a mere incident to the general business carried on in the premises in question; in other words, an attraction that might secure increased patronage in a center where competition was sharp and persistent.

It has been suggested, by argument and otherwise, that among the persuading objects of this prosecution are personal safety of attending guests and the preservation and conservation of good morals. These objects, however, cannot justify a forced construction of the charter provision, especially when existing remedies are entirely ade-

quate to guard and protect public morality and decency, as recently has been demonstrated by this court.

For the reasons stated herein, I am convinced the defendants should be acquitted. All concur.